**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4456-17T4

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

OCTAVIAN L. ROBINSON, a/k/a
ANTHONY T. ROBINSON, and
CASH ROBINSON,

    Defendant-Appellant.

_____

Argued telephonically April 2, 2020 –
Decided July 23, 2020

Before Judges Alvarez and DeAlmeida.

On appeal from the Superior Court of New Jersey, Law Division, Cumberland County, Indictment No. 16-03-0227.

Nicole Theresa Castiglione, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Nicole Theresa Castiglione, on the briefs).

Steven K. Cuttonaro, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney

General, attorney; Steven K. Cuttonaro, of counsel and on the brief).

PER CURIAM

Defendant Octavian L. Robinson appeals his convictions, after back-to-back jury trials, of a lesser-included charge of second-degree reckless manslaughter, N.J.S.A. 2C:11-4(b)(1); third-degree aggravated assault, N.J.S.A. 2C:12-1(b)(2); fourth-degree aggravated assault, N.J.S.A. 2C:12-1(b)(4); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b); second-degree possession of a weapon for unlawful purpose, N.J.S.A. 2C:39-4(a); and second-degree certain persons not to possess weapons, N.J.S.A. 2C:39-7(b)(1). The judge merged the offenses, with the exception of the certain persons crime, and sentenced defendant as a persistent offender, N.J.S.A. 2C:44-3(a), to a term of imprisonment of fifteen years, subject to the No Early Release Act, N.J.S.A. 2C:43-7.2. The judge ordered the certain persons term, eight years imprisonment subject to the statutory mandatory five years of parole ineligibility, to be served consecutively. Defendant now challenges the admission of an out-of-court identification, the judge's sua sponte decision to instruct the jury on the lesser-included reckless manslaughter when the indictment charged first-degree murder, N.J.S.A. 2C:11-3(a), the judge's

A-4456-17T4

management of jury deliberations, and the length of his sentence. For the reasons that follow, we affirm.

The trial testimony established the homicide occurred at approximately 8:00 p.m. on September 5, 2015, in front of a retail store. Immediately before the shooting, the store's video depicted four men who were interacting with the victim. Defendant was wearing a red shirt, black hat, and distinctive dreadlocks. He was the only person in the establishment with that hairstyle.

A store patron testified that while she was outside the front door, she saw a man with dreadlocks get into a confrontation with the victim, whom she described as a "big guy." When the man with the dreadlocks pulled his fist back to punch the victim, a gun fell to the ground. After seeing the weapon, the witness grabbed the two children who were with her and ran, hiding behind a car. Seven or eight gunshots followed.

The passenger of a vehicle passing by when shots were fired testified on defendant's behalf. In her rearview mirror, that witness saw the victim bent over, holding his back. She also saw two other men close to him. The witness thought they wore white t-shirts, but noted that one had dreadlocks. She saw the man with dreadlocks "standing over [the victim] like this with six more sounds of shots ringing." She described the dreadlocks as short, and denied,

3

when shown a photo taken from the store video, that the person with dreadlocks in the store was the perpetrator. On cross-examination, the witness acknowledged she only saw the backs of the men over the victim while the car was speeding away. Her observations were made through the car's side mirror.

The occupant of a nearby second-floor apartment, with a clear view of the front of the store, said he heard gunshots and immediately went to the window. He saw a white van parked in front, and two men positioned on either side—the shooter on the passenger side, the victim on the driver's side.

During the recorded interview, police asked this eyewitness to describe the shooter, and he said the shooter was slim and had dreadlocks that were "kind of long." The witness also said the shooter was wearing a red shirt and black capri pants, had a white stripe around the sleeves of his shirt, and wore a black hat with a brim all around. He saw the man drive away in a white van but did not see the license plate. He was unfamiliar with guns, but noticed the shooter used his right hand and that the gun was small. The man put the gun back in his pocket, moved towards the driver's side, and drove away. The witness also described the movements of the victim after being shot, from that moment to his collapse. The description was similar to the one he gave to the 911 operator—

that he saw a shooting in front of the store and that the assailant fled in a white van heading north.

After describing the incident, including the assailant, and after being given the appropriate Henderson[1] warnings, the witness was shown video recordings from inside the store, angled from behind the register. The film of the witness making the identification was played to the jury, as were the store recordings. The officer who played the recordings was not involved in the investigation. The opening frame at which the video was played to the witness depicted defendant standing next to the victim. During the trial, the witness was exhaustively cross-examined on the differences between his description of the shooter before he saw the video and on the stand.

Defendant is seen in the store video while wearing a black hat with a brim all around and a white stripe. He wore baggy capri pants and a red shirt. His hair was styled in dreadlocks.

During the pretrial Wade[2] hearing, the witness testified that he felt no pressure to identify anyone and that his memory was better at the police station

---

[1] State v. Henderson, 208 N.J. 208 (2011).
[2] United States v. Wade, 388 U.S. 218 (1967).

than at the hearing. The judge found both the officer who testified and the eyewitness to be credible.

The judge also found that police did not start the video at the point where defendant was standing next to the victim in order to draw attention to defendant. Nor did the court find error in the fact the officer rewound the video in order to clarify which of the two men with red shirts the witness was identifying.

The trial court also assessed the suggestiveness of the police's identification procedure using the <u>Henderson</u> system and estimator variables. 208 N.J. at 289-92. Weapon focus did not affect the witness's identification because he was across the street and the gun was not pointed at him. The events only lasted a few seconds "which would certainly diminish reliability[.]" The court noted the possibility of cross-racial bias because the witness is Hispanic and defendant African-American, but the witness specifically identified defendant as the shooter even though there were two African-American individuals in similar clothing in the footage. Therefore, the trial court found that defendant had not "established a very substantial likelihood of irreparable misidentification."

During the charge conference, the judge indicated he would instruct the jury on reckless manslaughter as well as murder. Defendant did not object.

When defendant moved for a new trial, one of the grounds for the application was that the court erred in providing the jury with the lesser-included option.

The trial court denied the motion, opining defendant's behavior established "a rational basis in the record to support the definition of reckless." The trial court reasoned that defendant's haphazard shooting in broad daylight in the presence of others was reckless behavior. Thus, "a rational jury could find that his behavior was reckless as opposed to purposeful or knowing."

Jury deliberations began the morning of December 19, 2017, at about 10:30 a.m. The jury was dismissed for the day at noon. The following day, December 20, the jury deliberated for approximately two hours and then sent out a note that it could not agree on a verdict. The trial court mistakenly thought the Allen[3] charge instructing them on further deliberations could only be given once. Because it was early in deliberations, the judge sent them to lunch. Before dismissing them, he said: "[y]ou're going to report directly to the jury deliberation room. I'm going to have you continue to deliberate at that time when you do get back, when you guys all get back . . . at that time."

The jury continued to deliberate until the following day, December 21. They sent another note to the court saying they could not agree on charges one

---

[3] Allen v. United States, 164 U.S. 492 (1896).

A-4456-17T4

to three.  The court then read the modified <u>Allen</u> charge verbatim to the jury.

<u>See</u> <u>Model Jury Charge (Criminal)</u>, "Judge's Instructions on Further Jury

Deliberations" (approved Jan. 14, 2013).  The jury came to a decision on all the

charges later that day.

During the sentencing hearing, the judge first resentenced defendant to a

prison term for a violation of probation.  Thus, this sentence was imposed

consecutive to that one.  The judge reviewed defendant's prior criminal history

in some detail, including eight prior indictable convictions, ten disorderly

persons offenses, and a juvenile adjudication.  Defendant was thirty-five years

old when convicted.  The judge found aggravating factors three, six, and nine,

based on defendant's criminal history.  N.J.S.A. 2C:44-1(a)(3), (6), and (9).

Applying a <u>Yarbough</u>[4] analysis, he sentenced defendant on the certain persons

crime consecutively because the offenses were separate and independent of each

other.

Now on appeal, defendant raises the following points:

---

[4]  <u>State v. Yarbough</u>, 100 N.J. 627 (1985).

POINT I

[The eyewitness's] IDENTIFICATION WAS UNRELIABLE, IMPERMISSIBLY SUGGESTIVE, AND SHOULD HAVE BEEN SUPPRESSED.

POINT II

THERE WAS NO RATIONAL BASIS TO CHARGE THE JURY WITH THE LESSER-INCLUDED OFFENSE OF RECKLESS MANSLAUGHTER.

POINT III

THE TRIAL COURT'S FAILURE TO INQUIRE ABOUT THE JURY'S IMPASSE OR GIVE A FURTHER JURY DELIBERATIONS CHARGE WAS PLAIN ERROR.

POINT IV

DEFENDANT'S SENTENCE IS MANIFESTLY EXCESSIVE.

I.

"An appellate court reviewing a motion to suppress evidence in a criminal case must uphold the factual findings underlying the trial court's decision, provided that those findings are 'supported by sufficient credible evidence in the record.'" State v. Boone, 232 N.J. 417, 425-26 (2017) (quoting State v. Scriven, 226 N.J. 20, 40 (2016)). However, we owe no deference to conclusions of law made by the trial court, which are reviewed de novo. Id. at 426. Findings of

fact are overturned "only if they are so clearly mistaken 'that the interests of justice demand intervention and correction.'" State v. Elders, 192 N.J. 224, 244 (2007) (quoting State v. Johnson, 42 N.J. 146, 162 (1964)).

II.

Defendant contends the trial court's admission of the eyewitness's identification was erroneous because the police presented him with the video in a manner that was impermissibly suggestive. Defendant further contends the witness should have been shown the store video from the first time defendant appears on the scene, alone, before he spoke to the victim.

Preliminarily, it would have been more prejudicial to do so than starting the video when defendant, along with three others, was talking to the victim. Showing the witness the portion of the video depicting only defendant would have been far more suggestive. The witness would have drawn the only logical explanation—that the individual was suspected of committing the crime. This would clearly have violated the spirit and methodology outlined in Henderson.

Furthermore, the witness from the apartment was not the only person who saw the shooter, a man wearing dreadlocks. A store patron testified that she saw the victim and a "big guy" wearing dreadlocks pull his fist back to punch the victim, at which time a gun fell to the ground. That witness fled.

A-4456-17T4

A witness in a car passing by who heard gunshots, and saw the victim bent over, saw two men wearing white shirts close to the victim. That description was mistaken, as at least the store video depicts the only person wearing dreadlocks to be wearing a red shirt—that individual being defendant. The woman in the vehicle saw a man in dreadlocks standing over the victim while she heard gun shots. Certainly, she denied that the person she saw with dreadlocks was defendant, however, she was also in a moving car watching events unfold in a side mirror. She focused on the dreadlocks—and no one claimed two men with dreadlocks were present at the scene. Thus, we do not agree the record supports the claim that the only witness who connected defendant to the shooting was the man who saw it from the apartment.

An identification should be suppressed only when a defendant has established "a 'very substantial likelihood of irreparable misidentification.'" Henderson, 208 N.J. at 238 (quoting State v. Madison, 109 N.J. 223, 232 (1988)), modified on other grounds, State v. Anthony, 237 N.J. 213 (2019). Suggestiveness can be demonstrated through analysis of system variables, those circumstances within the State's control. Those variables that apply to this particular out-of-court identification indicate no suggestiveness to the police's procedure. An officer with no knowledge of the circumstances of the crime

showed the video to the eyewitness. The witness was given appropriate pre-identification instruction and immediately identified defendant as the shooter with great confidence. Although he had to see the clip a second time, it was because the police officer wanted to be sure which man wearing a red shirt the witness was identifying.

Consideration of the estimator variables in this case do not establish suggestiveness either. The eyewitness, because he was viewing the incident from a distance, was not under extraordinary stress. See Henderson, 208 N.J. at 261-62. Although he saw a weapon, given the distance, it is unlikely to have affected his ability to describe the person wielding the gun. See id. at 262-63. The duration was brief, the distance and lighting not particularly helpful. See id. at 264. The witness was not under the influence, was shown the video within three days of the event, and it is not clear if racial bias played a role because he was Hispanic whereas the shooter was African-American. Id. at 265, 267.

In this case, the characteristics of the perpetrator worked to defendant's detriment. Every witness identified dreadlocks as a particular characteristic of the shooter. See id. at 266.

Thus, assessment of the <u>Henderson</u> factors demonstrates the identification process was not so impermissibly suggestive as to make the identification unreliable. All three witnesses identified the shooter as a man with dreadlocks. Although the video depicts defendant talking to the victim, the witness identified the man with dreadlocks wearing clothing similar to defendant's description before viewing the video.

We conclude that the State properly carried its burden to establish the identification was reliable, accounting for system and estimator variables. <u>See</u> <u>id.</u> at 289. Defendant simply failed to meet his burden to prove "a very substantial likelihood of irreparable misidentification." <u>Ibid.</u> The judge did not abuse his discretion in denying the <u>Wade</u> motion.

III.

Defendant contends that we should apply a harmful error standard to the issue of the judge's decision to charge reckless manslaughter because counsel raised the issue in the motion for a new trial. However, <u>Rule</u> 1:7-2 requires an objection to jury instructions be made "before the jury retires to consider its verdict[.]" In this case, no one objected to the judge's decision during the charge conference, to charge a lesser-included offense. Certainly erroneous jury instructions are "poor candidates for rehabilitation under the harmless error

philosophy[,]" but in this case, we apply the plain error standard. See State v. Simon, 79 N.J. 191, 206 (1979); R. 2:10-2. We overturn the jury's verdict only if in charging reckless manslaughter the judge made an error clearly capable of producing an unjust result. R. 2:10-2.

"The court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense." N.J.S.A. 2C:1-8(e). A rational basis imposes a low threshold for permitting a lesser-included offense. There must be a rational basis to convict of the lesser and acquit defendant of the greater charged offense. State v. Scherzer, 301 N.J. Super. 363, 480-81 (App. Div. 1997). When neither party requests such a charge, we "apply a higher standard, requiring the unrequested charged to be 'clearly indicated' from the record." State v. Alexander, 233 N.J. 132, 143 (2018). The trial judge has an "independent obligation" to instruct the jury on lesser-included charges when the evidence "clearly indicate[s] that a jury could convict on the lesser while acquitting on the greater offense." State v. Jenkins, 178 N.J. 347, 361 (2004).

A person commits reckless manslaughter when they consciously disregard a substantial and unjustifiable risk that death will result from their conduct. N.J.S.A. 2C:11-4(b)(1); N.J.S.A. 2C:2-2(b)(3). "The risk must be of such a

nature and degree that . . . its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation." N.J.S.A. 2C:2-2(b)(3). The degree of risk for recklessness must be more than "a mere possibility of death." State v. Curtis, 195 N.J. Super. 354, 364 (App. Div. 1984).

The Court recently considered the elements of murder. State v. Fowler, 239 N.J. 171, 184 (2019). In order to be convicted of murder, a person must act purposely or knowingly, states of mind defined as involving "the conscious object to engage in conduct of that nature or to cause such a result[,]" or the knowledge that "a result of his conduct . . . that it is practically certain that his conduct will cause such a result." N.J.S.A. 2C:2-2(b)(1), (2). The Court reiterated the language of N.J.S.A. 2C:2-3(b) which states that in order to be guilty of murder, a person's conduct must cause "the same kind of injury or harm as that designed or contemplated and not be too remote, accidental in its occurrence, or dependent on another's volitional act to have a just bearing on the actor's liability or on the gravity of his offense." Id. at 184.

In this case, defendant contends there was no rational basis because the shooting was committed within close physical proximity to the victim and the

number of shots fired establish an intent to kill. Thus, defendant argues, the only charge that could arise from those facts is murder.

It is undisputed that the confrontation between the victim and defendant, whatever it may have concerned, was spontaneous. It began with a physical confrontation. It involved a shooting across the hood of a car, and a number of shots fired wildly. For that reason, the State contends there was a factual basis for a rational jury finding that defendant acted recklessly when he began to shoot at the victim, and not, as is the case with murder, purposely or knowingly causing death or serious bodily injury resulting in death.

This confrontation was spontaneous. It began with an attempted punch, during which a gun fell out of the assailant's pocket. This suggests a spontaneous reaction. Although shooter and victim were in relatively close proximity, the shooting was, as the trial court said, haphazard. What jumps off the page in this case is that a spontaneous unplanned confrontation resulted in a killing. As the shots were fired in close quarters, two missed the victim. This is not an instance such as State v. Mendez, 252 N.J. Super. 155 (App. Div. 1991), where we found no rational basis to charge on reckless manslaughter because the defendant fired a machine gun into a crowd. Id. at 160-62. That defendant

had to know that it was practically certain that his conduct would cause death or serious bodily injury resulting in death to someone. Id. at 162.

Similarly, in State v. Sanchez, a defendant was convicted of murder where the trial court did not charge on reckless manslaughter. 224 N.J. Super. 231 (App. Div. 1988). We found that the lesser-included charge was not necessary where the victim was unarmed and shot in the face, neck, and chest with a shotgun. Id. at 243. Here the shooting took place across the hood of a car after a spontaneous argument. The evidence established that defendant could be convicted of the lesser offense while acquitted of the greater crime.

In State v. Hammond, a defendant was convicted of murder and argued on appeal the trial court erred in failing to instruct the jury on reckless manslaughter. 338 N.J. Super. 330, 332-33 (App. Div. 2001). Defendant, after beating the victim, shot him five times at close range while in an alley. There, we held the close-range killing left "no rational basis for a jury to have found anything but an intentional murder." Id. at 339. That case is also distinguishable. The temporal proximity between the beating and the shooting made it clear that the heightening of aggression was planned and deliberate.

A-4456-17T4

IV.

Defendant also claims the court was obligated to give the modified <u>Allen</u> charge once the jury advised the judge the first time that they were unable to reach a verdict.  <u>See</u> <u>Model Jury Charge (Criminal)</u>, "Judge's Instructions on Further Jury Deliberations" (approved Jan. 14, 2013).  The judge, since the jury had only been deliberating approximately three hours after a six-day trial, merely told the jury that he was sending them to lunch and that they would resume deliberations following their return.  Certainly, our Supreme Court has stated that "[a] supplemental charge that directs a jury to continue deliberating but does not remind them of their obligation . . . poses a grave risk of being misunderstood by the jurors and therefore, of being coercive[,]" <u>State v. Figueroa</u>, 190 N.J. 219, 240 (2007), but that case is a far cry from this.  There was nothing coercive about the judge's explanation that he was releasing the jury for lunch, after which they would resume deliberations.  The statement was not intended to "undo a jury deadlock." <u>State v. Czachor</u>, 82 N.J. 392, 398 (1980).  It was only intended to give the jurors the opportunity to eat a meal before continuing to deliberate.

The judge the following day did give the modified <u>Allen</u> charge, which resulted in the return of a verdict on the same day.  Certainly that the jury

deliberated for another day before again advising the court that they were at an impasse, is indicative of the fact that they understood when released for lunch, that they were not expected to reach a verdict upon their return. This argument does not require further discussion. R. 2:11-3(e)(2).

V.

Finally, defendant contends that he should have been sentenced on a concurrent basis for the certain persons and the reckless manslaughter convictions. "When multiple sentences of imprisonment are imposed on a defendant for more than one offense, . . . such multiple sentences shall run concurrently or consecutively as the court determines at the time of sentence." N.J.S.A. 2C:44-5(a). The New Jersey Supreme Court has provided a list of factors that should be considered by the sentencing court when determining if the sentences should be consecutive, including whether:

> (a) the crimes and their objectives were predominantly independent of each other;
>
> (b) the crimes involved separate acts of violence or threats of violence;
>
> (c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;
>
> (d) any of the crimes involved multiple victims;

A-4456-17T4

(e)    the convictions for which the sentences are to be imposed are numerous.

[State v. Yarbough, 100 N.J. 627, 644 (1985).]

Here, the trial court found the first, second, and fourth Yarbough factors applied in favor of a consecutive sentence. Defendant's violation of the certain persons statute was established by his possession of the weapon prior to his contact with the victim. Obviously, that was the commission of a crime entirely independent of the killing. Defendant possessed the gun, despite his prior criminal history, without reference to the victim. The reckless manslaughter offense had an entirely different victim than the act of illegal gun ownership, and was conduct engaged in unrelated to the certain persons offense.

In our view, the judge's discussion of the Yarbough factors was not an abuse of discretion. That is the touchstone of sentencing. Where the sentence imposed does not appear to be an abuse of discretion, we do not disturb it. This sentence fell within the sentencing code's guidelines. See State v. Lawless, 423 N.J. Super. 293, 299 (App. Div. 2011).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4456-17T4